APRIL LYNN FAKHOURY, *et al*.,

        Plaintiffs,

                                       Case No. 16-13323

v.                                        Hon. Gershwin A. Drain

JOHN B. O'REILLY JR., *et al*.,

        Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT JOHN B. O'REILLY'S MOTION FOR SUMMARY JUDGMENT [#100], GRANTING IN PART AND DENYING IN PART DEFENDANT CITY OF DEARBORN'S MOTION FOR SUMMARY JUDGMENT [#98], GRANTING DEFENDANT ANDREAS BARNET'S MOTION FOR SUMMARY JUDGMENT [#101], GRANTING IN PART AND DENYING IN PART DEFENDANT DEBRA WALLING'S MOTION FOR SUMMARY JUDGMENT [#105], GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE AFFIDAVIT OF HAKIM FAKHOURY [#134], OVERRULING PLAINTIFFS' OBJECTIONS TO DEFENDANTS' SUMMARY JUDGMENT EVIDENCE PURSUANT TO RULE 56(c)(2) [#135], GRANTING DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' ALLEGED 42 U.S.C. § 1983 CONSPIRACY CLAIM [#157], DENYING DEFENDANTS' MOTION TO STRIKE DOCUMENT 151 AND REFERENCES TO DOCUMENT FRAUD CONTAINED THEREIN [#160], DENYING PLAINTIFFS' MOTION TO STRIKE DEFENDANT CITY'S AND DEFENDANT O'REILLY'S REPLY BRIEFS [#149] AND SETTING STATUS CONFERENCE

## I. INTRODUCTION

Plaintiffs April and Hakim Fahoury are husband and wife and reside in

Defendant City of Dearborn. Plaintiffs allege that Defendant City, as well as

Defendants, John B. O'Reilly, the Mayor of the City, Lieutenant Andreas Barnet of the City Police Department and Debra Walling, Corporation Counsel for the City, violated Plaintiffs' constitutional rights by unlawfully subjecting them to harassment, intimidation, threats, prosecution without probable cause and financial ruin resulting in Plaintiffs' loss of commercial property in the west district of Defendant City.

Presently before the Court are the following motions filed by Defendants: (1) John B. O'Reilly's Motion for Summary Judgment, (2) Andreas Barnet's Motion for Summary Judgment, (3) Debra Walling's Motion for Summary Judgment, (4) the City of Dearborn's Motion for Summary Judgment, (5) Motion to Strike Affidavit of Hakim Fakhoury and Plaintiffs' Responses to Debra Walling's and the City's Motions for Summary Judgment, (6) Motion to Strike Plaintiffs' Alleged 42 U.S.C. § 1983 Conspiracy Claim, and (7) Motion to Strike Document 151 and References to Document Fraud Contained Therein.

Also, before the Court are (1) Plaintiffs' Motion to Strike Defendant City's and Defendant O'Reilly's Reply Briefs and (2) Plaintiffs' Objections to Defendants' Summary Judgment Evidence Pursuant to Rule 56(c)(2).

These matters are fully briefed and a hearing was held on April 30, 2019.

## II.    FACTUAL BACKGROUND

### A.  The Preferred Development Agreement with the City

The events giving rise to the instant action began in 2005 when Defendant City issued a Request for Proposals, which is a competitive bidding process by which developers applied within the city for a preferred development agreement ("PDA") that could lead to the purchase of city-owned property for development in the area of West Michigan Avenue.  The City awarded the bid to Dearborn Venture Partners ("DVP"), Plaintiff Hakim Fakhoury's business.  The PDA promised to award a final development agreement provided that DVP could meet certain benchmarks and deliver on a specific design criterion for a "high density mixed-use development containing specialty retail, office, housing components, entertainment, parking deck components and possibly a hotel."  *See* Defs.' Mot., Dkt. No. 98 at Ex 20, pg 668–69).

Once selected, Hakim began acquiring substantial property in west Dearborn.  Hakim worked with the City to identify and acquire old, dilapidated buildings in the area with the idea that the buildings would be demolished or redeveloped as part of the master plan.

Hakim maintains that there was an understanding that the City would only require that immediate health and fire issues with the buildings be remedied, but additional repairs would not be enforced because it would be a waste of money

since the buildings were to be demolished so that new buildings could be erected for the project. Hakim also applied and obtained Brownfield Tax Credits from the Michigan Economic Development Corporation ("MEDC").

In late 2006, Mayor Guido passed away and Defendant O'Reilly assumed the role of Mayor. Plaintiffs contend that as soon as O'Reilly came into power, everything changed in the City. O'Reilly ushered in "a strong mayor form of government," according to Thomas Tafelski, the President of the City Council. *See* Plf.'s Resp., Ex. A at 248. Tafelski describes O'Reilly as a bully; "people did not want to turn on him because they were worried about his vindictive nature." *Id.* at 291. Tafelski's experience was "if [O'Reilly] didn't like you . . . it was apparent, and he would . . . use what he has to make sure that he would delay stuff or he just would avoid you or he'd be nasty to you or he'd be vindictive." *Id.* at 65.

After O'Reilly became Mayor, Hakim approached him about a Building and Safety Inspector who had attempted to extort money from Hakim in order to obtain the City's cooperation and approval for his projects. This was the second incident of this nature. Hakim again refused and voiced his objection to the Mayor, who yelled at Hakim and told him to leave his office. As a result of Hakim's complaint, the relationship between Hakim and the Mayor became strained.

At the end of 2009, a City Council meeting was held with Hakim to discuss an extension to the DVP Project. At the meeting, Defendant Walling informed the Mayor that the Brownfield tax credits from the MEDC were available, but they were only available to the DVP and that the DVP must have control of all the property that's in the project. Plaintiffs claim this angered the Mayor.

At the meeting, Hakim voiced concerns about the lack of cooperation from the City concerning the DVP's project in west Dearborn. Hakim complained that the City's delays with permits and other issues was increasing Hakim's carrying costs because many of the buildings he purchased had remained vacant. The Mayor responded that the properties were vacant because the intent was to demolish the existing buildings. *See* Plf.'s Resp., Ex. H at 56. "[T]here's no point in improving the buildings" because they were "coming down anyway." *Id.*

Tensions between Hakim and the Mayor continued to boil. In early 2010, Hakim reiterated his opposition to paid parking and the delays he would experience with his projects. The relationship became so strained that the Mayor allegedly wanted Hakim out of the city. *See* Plf.'s Resp., Ex. A at 120. Plaintiffs claim that the personal animus lead the Mayor to order Building and Safety employees to aggressively enforce city code violations against the Fakhoury-owned buildings, despite the agreement Hakim had with the City regarding buildings considered to be "existing nonconforming" and the Mayor's

acknowledgment in 2009 that the buildings were to come down as part of the DVP's overall plan for commercial development in the western part of Defendant City.

According to the Chief Building Inspector, Keith Woodcock, the Mayor began instructing city inspectors to "write up all [Hakim's] buildings." *See* Plf.'s Resp., Ex. J. at 60. In fact, Woodcock believes that the City took actions to impede Plaintiffs' ability to develop the West Dearborn area as envisioned by the PDA. *Id*. at 63. He described that permits would not get issued, or stop-work orders would be created on projects that did have permits. *Id.* at 63, 83.

Woodcock described what staff referred to as the "FOM" or friends of the Mayor list. Individuals on this list would receive "passes" from the Mayor if any violations were discovered, whereas people who were not on the FOM list, did not receive passes and Building and Safety was required "to enforce everything according to the letter of the law." *Id*. at 20. Hakim was not on the FOM list. Plaintiffs claim that many of their tenants began moving out because of the heavy code enforcement. This left Plaintiffs with additional holding costs for vacant buildings that were part of DVP's project.

Woodcock believes that things between the City and Hakim got so bad that there were discussions that Hakim be stopped from buying new property in the City. Apparently, the Mayor called Hakim's bank, however Woodcock does not

know what was said.  O'Reilly even publicly implied that Hakim's money came from overseas and the implication was that it was somehow dirty or crooked money.

The Mayor denies any animus toward Plaintiffs.  O'Reilly points to the fact that while a council member he always voted for Hakim's projects, including 8 extensions of the PDA, which also made significant concessions favoring the Plaintiffs along the way.

However, Plaintiffs argue that the City continued to aggressively cite Hakim's buildings for violations on buildings solely purchased to become part of DVP's project.  The administration even attempted to demolish several of those same buildings.  Hakim filed a lawsuit seeking injunctive relief against the City to prevent the demolition. The City maintained that Hakim had already agreed to demolish the buildings, but refused to do so.  A settlement was ultimately reached where the City would refrain from demolishing the buildings and would extend the PDA.  The lawsuit increased tensions between the Mayor and Hakim.

### B.  Partnership with the Hamames

Eventually Hakim partnered with Mike and Sam Hamame. The Hamames also supported the removal of paid parking in the City because paid parking was harming their tenants' businesses.   Both the Hamames and Hakim were scheduled to meet with the Parking Advisory Committee to petition for the removal of paid

parking in the City. The meeting was set for January 17, 2013. However, Hakim received a call prior to the meeting and was informed that the Mayor had canceled the meeting. Plaintiffs contend that a meeting was then set up with the Mayor and the Hamames.

In February of 2013, Hakim received a phone call from Marwan Haidar, who informed him of a meeting that occurred at Habib Restaurant between the Mayor, Richard Mara, Sam Hamame and Mike Hamame. During the meeting, the Mayor allegedly informed the Hamames that if they wanted to do business in the City, they would have to sever their partnership with the Fakhoury family and divest them of their properties in the City.

The Defendants deny this meeting took place and deny that O'Reilly ever told the Hamames that they must sever ties with the Fakhourys. In fact, Defendants maintain that the Hamames had already initiated litigation to divest the Fakhourys of their properties. According to Defendants, it makes little sense that the Mayor told the Hamames to sever ties with the Fakhourys at this meeting because they had already initiated the legal process.

At his deposition, Haider testified that Hakim told him to call him and tell him about the meeting so that Hakim could record it. Haider further testified that Hakim offered to pay him $25,000.00 to commit perjury at his deposition. Hakim

denies that he asked Haider to call him or that he offered him money to commit perjury.

The Defendants maintain that the meeting took place in the Mayor's conference room, thus, consistent with Haidar's deposition testimony, he would have had no ability to overhear what took place at the meeting. Indeed, a February 15, 2013 sign-in sheet identifies the location of the meeting as the Mayor's conference room and indicates it was "catered by Habib's" and attended by Sam Hamame, Defendant Walling, Defendant O'Reilly, Guido and Mara.

Plaintiffs argue that there is evidence demonstrating the meeting took place in a restaurant because the Mayor's calendar lists Habib's phone number with the notation, "party of 4 confirmed." Additionally, Mara has testified that he does recall a meeting in early 2013 with the Mayor and the Hamames and that it took place either at "La Pita or Habibs." Mara further testified that he remembers discussions at the restaurant between the Mayor and the Hamames which concerned taking over properties and projects that the Fakhoury family jointly owned at the time.

### C) Police Involvement & Interactions

On February 12, 2013, Andreas Barnet,[1] a sergeant assigned to the detective unit of the police department, issued the City's first Special Intelligence Bulletin

---

[1] Barnet has been promoted to Lieutenant.

which labeled the Fakhourys as suspects and listed all of their vehicles and properties. The Bulletin stated that "court proceedings and evictions are imminent" and "Hamame feels that the possibility for violence will escalate[,]" thus officers were asked "to give special attention and extra patrols" to the Hamames' and Fakhourys' jointly owned properties.

Barnet testified that the genesis of the report was a complaint alleged by the Hamames against the Fakhourys. The Hamames scheduled a meeting with Barnet's supervisor, Lieutenant Patricia Penman. Barnet attended the meeting and took notes. The notes indicate that the Hamames' and the Fakhourys' business dealings had deteriorated such that Hamame had begun taking legal action against Hakim Fakhoury in late January of 2013. Hamame claimed that some evictions would occur on February 13, 2013. Given Hamame's allegations that violence could and would escalate rapidly and Barnet's knowledge of Hakim's son, Ray Fakhoury's past assaultive behavior and police contacts, Barnet decided to issue the Special Intelligence Bulletin, which he cleared with Lt. Penman.

On February 21, 2013, it is alleged that the Mayor falsely declared in public that the Fakhourys no longer owned any property in West Dearborn and that Mike Hamame had begun evictions of the Fakhoury family. He further stated that "this is a new day and the future is bright." Plaintiffs assert that the Mayor's statements resulted in tenants refusing to pay rent to the Plaintiffs. Tafelski has testified that

City officials, including the Mayor, told tenants to pay the bank or the Hamames, but not to pay any rent to the Fakhourys. *See* Plf.'s Resp., Ex. A at 93-97.

Plaintiffs allege that around this time, officers began following and harassing them. Officers would park across the street from their house at all hours of the day and night. Seven days after Barnet issued the Special Bulletin, he followed the Fakhoury family in an unmarked police car. He proceeded to follow them home and parked near their driveway. The Fakhourys then exited their driveway and Barnet ordered other officers to conduct a stop. At least four police cars surrounded the Fakhoury family. The Fakhourys claim several officers drew their weapons. The Defendants deny that any officers drew their firearms. According to Barnet, he stopped the Fakhourys "[t]o make sure that there was no crime regarding a possible trespassing incident and possibly some threats exchanged between Mr. Fakhoury and Mr. Hamame." Barnet instructed the Fakhourys to stay off of their properties.

It is alleged that the police harassment and intimidation of the Fakhoury family continued with the police preventing the Fakhourys from entering their properties. Hakim and April began forwarding documents to O'Reilly and Walling which evidenced their ownership of the properties. As Corporation Counsel, Walling was tasked with the duty to assert who had the right to be on the properties and she would consistently favor the Hamame family, even though the Hamames'

lawsuit was ongoing and there was no court order declaring the Hamames' ownership of the properties.

On February 26, 2013, the Fakhourys got a temporary restraining order which forbade the Hamames from collecting rent from the tenants. However, when the Fakhourys attempted to collect the rent, the tenant called Barnet who instructed the Fakhourys that, despite the TRO against the Hamames, the Mayor and Walling instructed the officers that the properties now belong to the Hamames.

On March 4, 2013, April called the police to tell them she had run into Hamame who told her "[y]ou Fakhourys are done in Dearborn . . . you guys are all wiped out. You guys haven't seen nothing yet . . . I got a bullet for you and your husband." When April told Hamame she was going to call the police, Hamame said "[c]all the police . . . I got Dearborn Police in the back of my pocket."

Barnet was assigned as the officer in charge. April claims that over the course of the next few weeks, Barnet would call and threaten her to withdraw her report or else she would go to jail for ninety days. Hamame vehemently denied April's claims. Barnet visited the area where the event occurred and tried to see if he could find any video cameras that covered the area but could find none. Barnet also received various affidavits from individuals who claimed to have been with Hamame when the incident occurred. Hamame took a polygraph test and passed it, however April refused to take a lie detector test. Barnet concluded the threats did

not occur and he charged April with filing a false police report. After a jury trial, she was acquitted.

Krystal Tulacz, a former assistant prosecutor for the City informed Hakim's attorney that prosecutors received direction from Walling to aggressively prosecute the Fakhoury family regardless of the circumstances, and to not provide any leniency. *Id*., Ex. DD, Affidavit of Amir Makled. In fact, Walling forbade Tulacz from offering any leniency to April on the filing a false police report charge, even though it was a first offense and generally citizens charged with a first offense are offered leniency by the City.

Plaintiffs claim that from 2013 until June of 2014, they pleaded with the Mayor and Walling to stop the police harassment of the Fakhoury family. The Mayor testified that he was aware of allegations that the Fakhoury's son was being stopped arbitrarily by the police, but claimed that he does not get involved in police matters. Yet, it appears the Mayor does get involved in police matters because he admitted later during his deposition that "[y]es, and that's something I contacted the police, the police chief, and had him look into it." *Id.*, Ex. G at 84-85.

On August 9, 2013, Hamame emailed Walling and O'Reilly regarding April Fakhoury collecting rent from a tenant. Walling immediately responded to Hamame and instructed Hamame to "make a report" and that she will personally

"forward the information to the police chief." By contrast however, the Fakhourys would send emails to Walling seeking assistance regarding property disputes with the Hamames. Walling would usually fail to respond or she would refuse to offer any assistance.

In August of 2013, Hamame wrongfully obtained an injunction from the state court banning the Fakhoury family from entering their properties. The Fakhourys and their children were arrested for trespassing whenever they attempted to enter their properties and collect rent. Because the injunction was entered in error, the state court judge ultimately rescinded the order and the Fakhourys' numerous trespassing charges were dropped.

### D) Complete Divestment of Commercial Properties in the City

Plaintiffs maintain that the City and the Hamames successfully divested them of their properties in June of 2014. Without any rent payments coming in, Plaintiffs' financial outlook was bleak which forced them to settle with the Hamames to mitigate their damages.

Again, it is alleged that the Mayor rewarded the Hamames for divesting the Plaintiffs of their properties by eliminating paid parking in October of 2014. Plaintiffs argue that the Mayor's phone records evidence a joint effort between the Hamames and the Mayor. Between January of 2014 and June of 2014, more than 55 calls were placed between the City and the Hamame family. The phone calls

ceased after Hamame and Fakhoury reached a settlement. Defendants counter and argue that the business relationship between the Hamames and the Fakhourys was already strained when the February 2013 meeting took place. Defendants argue that they had nothing to do with Plaintiffs' financial collapse.

## III.    PROCEDURAL BACKGROUND

Plaintiffs filed their First Amended Complaint on September 23, 2016. On March 14, 2017, Defendant City filed a Motion to Dismiss and Defendants O'Reilly, William Debiasi, Assistant Prosecutor for the City, Barnet, Ron Haddad, Chief of Police, and Walling filed their Motion to Dismiss. On October 24, 2017, the Court issued an Opinion and Order Granting in Part and Denying in Part Defendants' Motions to Dismiss.

The Court's Opinion and Order dismissed all of the malicious prosecution claims that arose from charges related to the Hamames' August 16, 2013 injunction order. As such, the only remaining facts that support April's malicious prosecution claim are those that are unrelated to the August 16, 2013 state court injunction, or April's March 4, 2013 charge for filing a false police report and April's August 1, 2013 charge for frauds unlawful. April's malicious prosecution claim remained against the City, Barnet, Haddad, O'Reilly and Walling (Counts I and II). Defendant DeBiasi was dismissed on the basis of absolute immunity.

The Court's Opinion and Order also determined that Plaintiffs had sufficiently pled an equal protection class-of-one claim against Defendant City, O'Reilly, Haddad, Walling and Barnet (Count III). Finally, the Court also held that Plaintiffs had stated a viable First Amendment retaliation claim (Count IV) against Defendant City, O'Reilly, Barnet and Walling. The Court dismissed Count V for conspiracy in violation of 42 U.S.C. § 1985 because Plaintiffs did not allege they are members of a protected class. Finally, the Court declined to exercise supplemental jurisdiction over Plaintiffs' state law claims.

On December 8, 2017, the Court entered a stipulation and order to dismiss Defendant Haddad from all counts and Defendant Barnet from all counts except for Count I. On August 9, 2018, the Court denied Defendants' second attempt to dismiss Plaintiffs' malicious prosecution, equal protection and retaliation claims when it rejected Defendants' arguments in support of their Rule 12(c) Motion for Judgment on the Pleadings.

## IV. LAW & ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall be granted if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998) (quotations omitted). The court

must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### B. Defendants O'Reilly's, Barnet's and Walling's Motions for Summary Judgment

#### 1. Malicious Prosecution

Defendants argue that Barnet had probable cause to charge April for filing a false police report. Thus, her malicious prosecution claim fails as a matter of law. "To state a valid federal civil rights claim for malicious prosecution in violation of the Fourth Amendment, a plaintiff must allege facts meeting four elements: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4)

the criminal proceeding was resolved in the plaintiff's favor." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015) (internal quotations omitted).

As an initial matter, there are two charges that form the basis of April's malicious prosecution claim. The first charge was for filing a false police report, issued on March 4, 2013. The second charge was for frauds unlawful, issued on August 1, 2013.

As to the false police report charge, the Court concludes that Barnet had probable cause to charge April for filing a false police report. Probable cause exists when the police have reasonably trustworthy information sufficient to warrant a prudent man in the belief that the petitioner had committed or was committing an offense. Probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest. *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008); *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000).

Barnet's reliance on his investigation and the facts he uncovered satisfies the quantum of proof necessary to meet the standard of "reasonable grounds for belief, supported by less than prima facie proof, but more than mere suspicion" or "reasonably trustworthy information sufficient to warrant a prudent man in the belief that the petitioner had committed or was committing an offense." *United States v. Graham*, 275 F.3d 490, 496 (6th Cir. 2001); *Harris*, 513 F.3d at 511.

Barnet collected six affidavits from several witnesses claiming that Hamame had been with them during the time that April claimed Hamame had threatened her. In addition to the affidavits, Barnet only knew Hamame to drive a red BMW, and not a white BMW, the color of the vehicle April claimed Hamame was driving when he made the threats. Barnet canvased the area but there was no available video footage, nor any witnesses to the incident. Lastly, Barnet knew that Hamame had passed a lie detector test and that April refused to take a lie detector test. Here, the facts that Barnet had available gave him reasonable grounds to believe that April filed a false police report. Accordingly, Plaintiff April's malicious prosecution claim as to the false police report charge fails as a matter of law because Barnet possessed probable cause to prosecute April.

Even if Plaintiffs could establish there was no probable cause to arrest April for the filing a false police report, Barnet would still be entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vance v. Wade*, 546 F.3d 774, 781 (6th Cir. 2008).

In order for a right to be clearly established, it must be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 782. A reasonable officer possessing the information that Barnet possessed after his

investigation would not believe that charging April for filing a false police report was unlawful. *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) ("[A]n arresting agent is entitled to qualified immunity if he or she could reasonably [even if erroneously] have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent.")

Because the Court concludes that Plaintiff cannot establish the absence of probable cause, Plaintiff's malicious prosecution claim related to the false police report charge fails as a matter of law against all of the Defendants—the City, O'Reilly, Walling and Barnet.

As to the frauds unlawful charge, Plaintiffs have failed to come forward with any evidence that Barnet was involved in this charge. Detective Gary Mann was the officer assigned to that investigation and charged April with frauds unlawful for collecting rent from a tenant. Barnet is likewise entitled to judgment in his favor as to April's malicious prosecution claim stemming from the frauds unlawful charge.

As to the remaining Defendants, Mann has submitted an affidavit stating that neither O'Reilly or Walling interfered with, participated in or provided any direction for Mann's investigation of the frauds unlawful charge. However, Plaintiffs rely on an April 9, 2013 email from Walling to Hamame. Hamame sent Walling an email with the subject line "April Fakhoury Fraud," which alleged that

April had been to some of the properties and had collected rent. Walling responded by telling Hamame "to file a police report" and that she would "forward the report to the police chief." Walling copied the Mayor on this correspondence.

Defendants argue that Walling is entitled to absolute immunity for this conduct. "A prosecutor is entitled to absolute immunity when that prosecutor acts 'as an advocate for the State' and engages in activity that is 'intimately associated with the judicial phase of the criminal process'" *Prince v. Hicks*. 198 F.3d 607, 611 (6th Cir. 1999).

Here, the Court concludes that Walling's email to Hamame was administrative, therefore she cannot invoke absolute immunity as a defense. "Absolute prosecutorial immunity is justified only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation inducing conduct." *Ireland v. Tunis*, 113 F.3d 1435 (6th Cir.), cert denied, 522 U.S. 996 (1997). For instance, prosecutors are not absolutely immune from suit "for giving advice to the police" as such conduct constitutes "administrative or investigative acts unrelated to judicial proceedings . . . ." *Ireland*, 113 F.3d at 1445. Because Walling's August 9, 2013 email was not connected to her role in judicial proceedings, she is precluded from relying on absolute immunity.

However, Walling is entitled to qualified immunity. A reasonable official in Walling's position would not believe that responding to Hamame's email

instructing him to file a police report so that she could forward it to the chief of police would violate the constitution or laws of the United States.

As to O'Reilly, Plaintiff must show that O'Reilly "either actively participated in alleged unconstitutional conduct or implicitly authorized, approved, or knowingly acquiesced in offending" Plaintiff's constitutional rights. *Webb. v. United States*, 789 F.3d 647 (6th Cir. 2015).

Here, the Court concludes that Plaintiffs have failed to come forward with any admissible evidence that O'Reilly "either actively participated in" or that he "implicitly authorized, approved, or knowingly acquiesced in offending" April's right to be free from malicious prosecution for the frauds unlawful charge. The only evidence the Plaintiffs have produced is that O'Reilly was copied on Walling's August 9, 2013 email directing Hamame to file a police report. There is no evidence that O'Reilly even read this email. Thus, his inaction upon receipt of the email falls short of "actively participat[ing] in alleged unconstitutional conduct" or "implicitly authoriz[ing], or knowingly acquiesce[ing] in offending" April's constitutional rights. *Id.* O'Reilly is likewise entitled to qualified immunity because a reasonable official in his position would not believe his conduct was unlawful.

Accordingly, all of the Defendants are entitled to summary judgment on April's malicious prosecution claim.

## 2. Equal Protection Class-of-One

Defendants argue that O'Reilly and Walling are entitled to qualified immunity on Plaintiffs' Equal Protection claim because Plaintiffs have failed to come forward with any evidence that O'Reilly and Walling took acts that had a disparate impact on the Plaintiffs while favoring the Hamame family. The Court disagrees.

Plaintiffs have come forward with evidence that the Mayor was informing City Council members to tell the tenants to stop paying rent to the Fakhourys and to only make payments to the Hamames. Walling and the Mayor also instructed the police to prevent the Fakhourys from entering their properties to collect rent, while the Hamames were permitted to enter the properties and collect rent. Evidence also reveals that Hamame had direct access to Barnet and Walling, while the Fakhourys request for police protection from the Hamames would be ignored. On the other hand, if Hamame contacted Walling, Plaintiffs would immediately be investigated. Contrary to Defendants' assertion, Plaintiffs have come forward with evidence that the City, through O'Reilly and Walling, intentionally treated two business owners in the City differently.

Plaintiffs must demonstrate that "the differential treatment [they] were subjected to is so unrelated to the achievement of any combination of legitimate purposes that the" only conclusion to be made is that the Government's actions

"were irrational." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty., Ohio*, 430 F.3d 783, 791 (6th Cir. 2005); *see also Rondigo, LLC v. Twp of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011). A plaintiff may demonstrate a lack of rational basis "by demonstrating that the challenged government act was motivated by animus or ill-will." *Warren v. City of Athens,* Ohio, 411 F.3d 697, 711 (6th Cir.2005).

The Court concludes that a jury could determine that the Mayor and Walling "implicitly authorized, approved, or knowingly acquiesced" in the unconstitutional conduct taken against the Plaintiffs in 2013 and 2014. A jury could also determine that the differential treatment that the Fakhoury family received was based on O'Reilly's ill-will and a desire to divest the Fakhoury family of their property and status within the City of Dearborn.[2]

Moreover, O'Reilly and Walling are not entitled to qualified immunity. It is alleged that O'Reilly falsely declared in public that the Fakhourys no longer owned property in the City and told tenants not to pay their rent to the Fakhourys. The Mayor and Walling instructed tenants to only pay the Hamames when there was no court order terminating Plaintiff's joint interests in the properties. The Mayor and

---

[2] Defendants also argue that Plaintiffs' claim fails for the separate reason that Plaintiffs cannot establish that they are similarly situated to the Hamames. However, "[d]etermining whether individuals are similarly situated is generally a factual issue for the jury." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 463 (6th Cir. 2012); *Ryan v. City of Detroit*, 698 F. App'x 272, 279 (6th Cir. 2017).

Walling are also alleged to have told the police to prevent the Fakhourys from entering their properties but to allow the Hamames full access to the properties. Looking at the evidence most favorable to Plaintiff, O'Reilly and Walling are not entitled to qualified immunity because a reasonable official would know that there was no rational basis for favoring, and providing preferential treatment to the Hamame family. Defendants Walling and O'Reilly are not entitled to summary judgment on Plaintiff's equal protection claim.

### 3. First Amendment Retaliation Claim

Plaintiffs "have a First Amendment right to criticize public officials and to be free from retaliation for doing so." *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010). In order to establish a retaliation claim under the First Amendment, Plaintiffs must show that (1) they engaged in protected conduct, (2) an adverse action was taken against them that would deter a person of ordinary firmness from continuing to engage in that conduct, and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the Plaintiffs' protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1994).

Here, it is undisputed that Hakim engaged in protected activity by repeatedly raising issues of public concern until 2014, including (1) Building and Safety employees attempting to bribe Hakim in order to get City cooperation, (2)

Certificate of Occupancy Certificates being issued to Hakim's tenants without proper approval, and (3) the detrimental effect paid parking created for business owners in the City. Hakim also filed a lawsuit against the City to prevent the City from demolishing three of his buildings.

As to April, the only protected activity advanced by Plaintiffs is that April filed a citizen's complaint against Barnet. However, Plaintiffs have offered no evidence that Walling or the Mayor knew of her complaint against Barnet or that they were motivated to act based on it. Even though April cannot demonstrate she engaged in protected activity, she can still maintain a claim of First Amendment retaliation because "a plaintiff may allege First Amendment retaliation after a relative has engaged in protected speech even if the plaintiff herself had not done so." *Nation v. University of Cincinnati*, 715 F. App'x 509 (6th Cir. 2017); *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534, 540-42 (6th Cir. 2003).

Here, there is evidence that Defendant O'Reilly took adverse actions against the Fakhourys due to animus towards Hakim. The Mayor instructed everyone in the City to prevent the Fakhourys from entering their properties even though the court had not yet resolved the Hamame and Fakhoury property dispute. The Mayor also told Plaintiffs' tenants not to pay them rent. The Mayor publicly and inaccurately stated that the Plaintiffs no longer own any properties in the City.

Finally, the last prong of the retaliation test – whether there is a causal connection between Plaintiffs' protected conduct and O'Reilly's adverse actions – "is usually a matter best suited for the jury." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 305 (6th Cir. 2012). "A causal link can be shown through direct or circumstantial evidence; including showing temporal proximity between engaging in protected activity and suffering an adverse action," *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010) or demonstrating "the disparate treatment of similarly situated individuals." *Thaddeus-X*, 175 F.3d at 399.

However, Plaintiffs' First Amendment retaliation claim against Walling fails because Plaintiffs have no evidence that Walling's actions were motivated by Hakim's protected conduct. Rather, Plaintiffs' evidence could lead a reasonable jury to conclude that O'Reilly acted because of Hakim's criticisms concerning City matters and due to Hakim's lawsuit against the City. Plaintiffs' evidence as to Walling is that she was employed at the pleasure of the Mayor. Thus, her purported conduct was not motivated by Hakim's protected activity. Rather, Walling was merely following O'Reilly's directives. Walling is entitled to summary judgment on Plaintiffs' First Amendment retaliation claim.

Contrary to O'Reilly's arguments, he is not entitled to qualified immunity. A reasonable official in his position would know that it is unlawful to implement and act on a plan to divest citizens of their property in retribution for speaking out

against the City's policies and for filing a lawsuit against the City. Accordingly, O'Reilly is likewise not entitled to summary judgment on Plaintiffs' First Amendment claim.

## C. Defendant City's Motion for Summary Judgment

The City makes two arguments in support of its Motion for Summary Judgment. The first argument concerns the timeliness of Plaintiffs' claims. However, the Court has already considered and rejected a statute of limitations argument in its August 9, 2018 Order denying Defendants' Motion for Judgment on the Pleadings. The Court's Order concluded that the Plaintiffs' injury, loss of their commercial properties to the Hamame family in June of 2014, provided them until June of 2017 to file the instant lawsuit. Plaintiffs therefore timely filed this action on September 13, 2016.

In its present motion, the City argues that the Court's previous conclusion was erroneous because Plaintiffs did not own the properties at issue in this lawsuit during the relevant time period, or during 2013 through 2014, when the Mayor's plan to divest the Fakhourys of their properties was implemented. Defendants also point to both April's and Hakim's testimony from another proceeding wherein both claimed that the limited liability companies lost control of the properties long

before 2010 because of multiple loan defaults. As such, Defendants maintain Plaintiffs had nothing to be divested from as early as 2010.[3]

Plaintiffs counter that Defendants' arguments regarding timeliness are without merit. Plaintiffs have produced proof of the partnership agreements between the Hamames and the Fakhourys, as well as evidence that the Hamame family paid a total of $2,250,000 to the Fakhourys in June of 2014 which completely divested the Fakhourys of their interests in the disputed properties. Thus, this lawsuit was timely filed in September of 2016 because it was filed less than three years from June of 2014.

Defendants also renew their request for dismissal based upon Plaintiffs' counsel's email correspondence stemming from a previous lawsuit. In the correspondence, counsel states that Plaintiffs had "suspicion that [Hakim Fakhoury] was being selectively targeted (and harassed) by the City to divest him of his millions of dollars in properties without due process." Thus, Defendants maintain that Plaintiffs were aware of their injuries at the latest around May 24, 2011, yet did not file this action until September of 2016, well beyond the applicable 3-year statute of limitations.

---

[3] As proof, Defendants assert that Hakim has not filed a tax return in eleven years, however Hakim disputes this. Hakim's Corrected Affidavit includes tax returns from 2007 through 2016, with the exception of 2010, which was the year Hakim "went under receivership and no tax return was filed for that year."

This argument is likewise without merit because Plaintiffs' Amended Complaint alleges conduct in 2013—threats, police and building department harassment and intimidation, and prohibiting the collection of rental payments from tenants of properties owned by the Fakhourys—as the basis for their injuries. The Court will deny this renewed argument because Plaintiffs timely filed the instant action.

The City also asserts that Plaintiffs cannot establish their municipal liability claim because they have no evidence of an official policy or custom undertaken by a final decisionmaker. Defendant City also argues that there is no evidence that Plaintiffs' pleas for help from City officials were ignored. Finally, Defendants argue that the Mayor and Walling are not "final decision makers."

A municipality can be liable for acts that it "sanctioned or ordered" and an "official policy often refers to formal rules or understandings – often but not always committed to writing – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). A single decision can constitute a "policy." *Id*. A "final decision maker" is one who has "final authority to establish municipal policy with respect to the action ordered." *Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013). A final decision maker is one "with final policymaking authority" and any actions taken by those officials are attributable to

the governmental entity. *Sudul v. City of Hamtramack*, 221 Mich. App. 455, 498 (1997); *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993).

Here, there is evidence that O'Reilly publicly stated that the Plaintiffs no longer own property in the west district and the "future is bright." O'Reilly declined to retract these statements even though tenants began refusing to pay rent to the Fakhourys, who still jointly owned the properties with the Hamames. In fact, the Mayor's and Walling's strategy involved prohibiting the Plaintiffs from collecting any rents on their jointly owned properties. The record is also replete with evidence of the Plaintiffs repeatedly contacting the Mayor or Walling asking that they cease the police harassment of Plaintiffs, yet the City failed to take any action, or even respond in many cases.

Based on the record before the Court, there remains questions of fact as to whether O'Reilly and Walling are final decision makers sufficient to subject the City to liability. For this reason, the City's Motion for Summary Judgment is granted in part and denied in part.

### D. Plaintiffs' Objections to Defendants' Summary Judgment Evidence Pursuant to Rule 56(c)(2)

Plaintiffs have filed objections to Defendants' evidence in support of their summary judgment motions. Plaintiffs complain that Defendants have filed approximately 40 exhibits consisting of police reports stemming from incidents

occurring between 1990 and 2016. Federal Rule of Civil Procedure 56(c)(2) states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *Id.*, 2010 Advisory Committee Notes.

Plaintiffs argue the relevant time period is early 2013, when the Mayor and other City officials conspired with the Hamame family to divest the Plaintiffs of their commercial properties, through the summer of 2014 when the Plaintiffs entered into a settlement agreement with the Hamames. Thus, any police reports prior to February of 2013 and after June of 2014 are not relevant to the instant action and are inadmissible.

Plaintiffs also object to the use of any police reports that occurred between February of 2013 and June of 2014 because there is little to no evidence that Defendants were aware of the police reports during the events giving rise to this action. Plaintiffs also assert that the reports contain improper character evidence and are more prejudicial than probative. Lastly, Plaintiffs maintain that during discovery in this matter, Defendants produced multiple versions of various police reports which suggest that some of the police reports have been altered after the date the report was initially generated. For example, there are two separate

versions of police report number 130007430-001, wherein the first version includes Barnet's admission that he notified the West Bloomfield police department about the Fakhourys' alleged threats to the Hamames. The second version of this report omits Barnet's admission about notifying the West Bloomfield police department.

The Court concludes that the police reports are relevant because they rebut Plaintiffs' claims that the City and its officials unfairly targeted them since Plaintiffs have extensive police contacts in many other cities predating O'Reilly's mayoral term. The police reports also refute Plaintiffs' argument that they are similarly situated to the Hamames because the Hamames do not have extensive police contacts.

Based on the foregoing considerations, the Court will overrule Plaintiffs' objections to Defendants' summary judgment evidence and will consider this evidence in ruling on Defendants' respective motions. At trial, the Court will revisit the issue of the admissibility of the reports and decide whether Plaintiffs' arguments concerning witness knowledge, hearsay and prejudice should preclude their admissibility.

### E. Defendants' Motion to Strike Hakim Fakhoury's Affidavit

In their present motion, Defendants seek to strike Plaintiffs' response to the City of Dearborn's Motion for Summary Judgment for purportedly being untimely

and not conforming to local rule page requirements.  Defendants further object to Hakim's affidavit submitted in support of Plaintiffs' Response to the City's Motion for Summary Judgment.  Specifically, Defendants argue that Hakim's affidavit is a sham affidavit and fails to conform to the requirements of affidavits submitted in opposition to summary judgment motions.  Alternatively, in the event this Court does not strike the entire affidavit, Defendants seek to strike individual paragraphs within the affidavit for the following reasons:

- Paragraphs 4, 9, 10, 11, 12, and 18 attempt to create sham facts.
- Paragraphs 6, 21, 28, 30, 31, 34, 35 contain inadmissible hearsay.
- Paragraphs 4, 5, 6, 7, 8, 10, 12, 13, 14, 17, 18, 21, 22, 24, 25, 26, 29, 31, 33, 34, 35, 36, 37, 38, 40, 41(b), 41(c), 41(d), 41(e), 41(f), 41(g), 41(h), 41(i), 41(j), 42, 43, 44, and 45 lack foundation, personal knowledge, or otherwise state conclusory allegations.
- Paragraphs 6, 15, 20, 24, 25, 26, 28, 29, 30, 31, 41(a) lack relevance.
- Paragraphs 29 and 30 reference witnesses not identified in Plaintiffs' Rule 26(a) Disclosure of Witness Lists.
- Exhibits A, F, I, J, K, and Y should be stricken because they are responsive to Defendants' Requests for Production, but were not previously disclosed.
- Exhibits X, I, T, B, G, and JJ should be stricken for being untimely submitted.

Finally, Defendants argue Plaintiffs' Response to Defendant Walling's Motion for Summary Judgment should be stricken for being untimely.

### 1.   Timeliness and Page Limits

Defendants argue that Plaintiffs' Response to the City of Dearborn's Motion for Summary Judgment exceeded the 25 page limit required by the Courts local

rules. Local Rule 7.1(d)(3) states "a brief supporting a motion or response . . . may not exceed 25 pages." E.D. Mich. L.R. 7.1(d)(3). While Plaintiffs' Response did exceed 25 pages the only portion of the brief to exceed 25 pages was the Attorney's signature. Additionally, Plaintiffs corrected this error the following morning. Because this error was harmless and appears to be the result of a formatting error, the Court will not strike Plaintiffs' Response.

Defendants further argue Plaintiffs' Response to Walling's Motion for Summary Judgment and Plaintiffs' Response to the City of Dearborn's Motion for Summary Judgment were untimely filed. Local Rule 7.1(e)(1)(A)-(B) states that "[a] response to dispositive motion must be filed within 21 days after service of the motion." E.D. Mich. L.R. 7.1(e)(1)(A)-(B).

Plaintiffs' Responses were not untimely filed because the Court granted Plaintiffs' request for an extension of time to respond to Defendants' summary judgment motions. Therefore, Plaintiffs' Response to the City was due no later than January 14, 2019, and Plaintiffs' Response to Defendant Walling's Motion for Summary Judgment was due no later than January 18, 2019. Both Responses were therefore timely filed.

### 2. Objections to Hakim's Affidavit

Defendants also argue Hakim's affidavit is a sham affidavit and should be stricken from the record entirely. Short of that, Defendants argue individual

paragraphs either create sham facts, are hearsay, lack relevance or introduce information that should have been introduced prior to the close of discovery.

### i. Objections to Paragraphs that Create Sham Facts

Defendants' argue that paragraphs 4, 9, 10, 11, 12, and 18 create sham fact issues. If an affidavit directly contradicts prior sworn testimony, it should be stricken unless, the party opposing summary judgment provides a persuasive justification for the contradictions. *Reid v. Sears*, 790 F.2d. 453 (6th Cir. 1986). Defendants correctly identify the governing law, but fail to specifically point out how any of the cited paragraphs are contrary to prior sworn testimony. For this reason, the Court will not strike 4, 9, 10, 11, 12, and 18.

### ii. Objections to Statements as Inadmissible Hearsay

Defendants argue that paragraphs 6, 21, 28, 30, 31, 34, 35 and 38 should be stricken from the record because they are inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the trust of the matter asserted." Fed. R. Evid. 801(c). Rule 56(e) requires that declarations contain statements that would be otherwise "admissible in evidence," thus declarations cannot contain hearsay. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997) (hearsay evidence may not be considered on a motion for summary

judgment). None of the statements identified by the Defendant, however, are hearsay.

Here, paragraphs #6 and #38 contain only declarations by Mr. Fakhoury and thus are not hearsay.

Paragraphs #21, #28, and #30 contain statements of City Officials. When a statement is "offered against an opposing party and….was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" it is not considered hearsay. Fed. R. Evid. 801(d)(2)(d). Under this exception to the hearsay rule the statements of Cynthia J. Grimwade Sr. in paragraph #21, the statements of Debra Walling in paragraph #28, and the statements of John Tanner III in paragraph #30 are admissible.

Paragraphs #21, #31, and #35 all contain statements that are supported by business records. Fed. R. of Evid. 803(6) allows for the inclusion of statements that would otherwise be considered hearsay if "the record was kept in the course of a regularly conducted activity of a business [or] organization. Thus, Mr. Fakhoury's statements in paragraphs #21, #31 and #35 are all admissible.

### iii. Objections based on Lack of Foundation, Personal Knowledge, or Conclusory Allegations.

Defendants argue paragraphs 4, 5, 6, 7, 8, 10, 12, 13, 14, 17, 18, 21, 22, 24, 25, 26, 29, 31, 33, 34, 35, 36, 37, 38, 40, 41(b), 41(c), 41(d), 41(e), 41(f), 41(g), 41(h), 41(i), 41(j), 42, 43, 44, and 45 should be stricken because Mr. Fakhoury

lacked foundation or personal knowledge or because they state conclusory allegations.

A witness's testimony, whether it is live and/or in a declaration, must be based on that individual's personal knowledge of the facts asserted. Fed. R. Evid. 602. The Sixth Circuit has held that "the threshold for Rule 602 is low" and "'testimony should not be excluded for a lack of personal knowledge unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the events that he testified about.'" *United States v. Franklin*, 415 F.3d 537, 549 (6th Cir. 2005) (quoting *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990)).

As an initial matter, Defendants make no argument with respect to paragraphs 10, 12, 13, 21, 22, 25, 26, 31, 34, 35, 38, 42, 43, 44, and 45, thus the Court will draw the conclusion that these paragraphs are not challenged.

With respect to the remaining paragraphs, Defendants argue that they are either conclusory or lacking in foundation. Applying the standards discussed above the Court concludes paragraphs 4, 5, 6, 7, 8, 14, 16, 17, 18, 24, 29, 33, 40, and 41(b) through 41(j) are all based on Hakim's personal knowledge as he was a participant in the events and appropriate in a Rule 56 Affidavit. *See Buchanan v. City of Bolivar*, 99 F.3d 1352, 1355 n. 2 (6th Cir. 1996).

### iv.   Objections to Statements in Hakim Fakhoury's Affidavit for Lack of Relevance

Defendants argue paragraphs 6, 15, 20, 24, 25, 26, 28, 29, 30, 31, 41(a) lack relevance. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 401. The final sentence of paragraph #6 discusses Defendants' attorney's relationship to Haidar, a witness for the Plaintiff, through the representation of Haider's girlfriend. The Court does not find this information probative of the issues at hand in this case and, therefore, feels the final sentence of this averment #6 should be stricken.

With respect to paragraph #15, Defendants argue that mere knowledge of a call without knowing its contents is irrelevant to the issues herein. However, given the context in which the call was made and the parties involved, the Court finds that a jury could find this information probative of the relationship between Mike Hamame and the Mayor.

Additionally, paragraph #20 is relevant to the time period that the relationship between the Fakhourys and the Hamames began to fray.

Paragraphs 24, 25, 26, and 28 all discuss Hakim's relationship with the previous Mayor of the City of Dearborn. The contrast is probative as it indicates there is something unique about the current Mayor that results in the negative relationship between the parties.

Paragraphs 29, 30 and 31 all speak to the animus between O'Reilly and the Plaintiffs which cut to the core of the issues at hand and therefore these paragraphs are very relevant.

Finally, paragraph 41(a) contrasts the treatment of the Hamame and Fakhoury families which cuts to the core of the Plaintiffs' claims and therefore is relevant.

For the above reason the Court will strike the last sentence of averment #6, but otherwise retain the statements of Hakim Fakhoury's affidavit on relevance grounds.

**v.      Objections to Exhibits attached to Hakim Fakhoury's Affidavit.**

Defendants further argue exhibits A, F, I, J, K, and Y to Hakim's affidavit should be stricken because they are responsive to Defendants' Requests for Production, but were not previously disclosed. Defendants also assert that exhibits X, I, T, B, G, and JJ should be stricken for being untimely submitted.

As an initial matter exhibits X, I, T, B, G, and JJ were all filed in a timely fashion. All exhibits were filed either on January 14, 2019 or January 17, 2019. Subsequent amendments to each exhibit were filed after these deadlines, but these amendments were not substantive and merely removed Plaintiffs' attorney's notes or provided an index of documents contained in the exhibit. The Court finds these amendments to be harmless and justified.

With respect to exhibits A, F, I, J, and K, each is a document that was submitted for impeachment purposes. Thus, Plaintiffs did not run afoul of Rule 26(a)(1)(ii). Thus, there is no basis upon which to strike these exhibits.

Accordingly, the Court will grant in part and deny in part Defendants' Motion to Strike Affidavit of Hakim Fakhoury and Plaintiffs' Responses to Walling's and the City's Motions for Summary Judgment. The last sentence in paragraph six in Hakim's affidavit is stricken.

## F. Defendants' Motion to Strike Plaintiffs' Alleged 42 U.S.C. § 1983 Conspiracy Claim

Defendants complain that Plaintiffs have come forward with "a brand-new, never before plead cause of action out of ether[;]" specifically, a count for § 1983 conspiracy and they ask that the Court strike it. Plaintiffs argue their entire case centers upon the conspiracy between the Defendants and the Hamames to divest the Plaintiffs of their properties.

Upon review of the parties' briefing, the Court concludes that Defendants did not receive adequate notice and would be unduly prejudiced if the Court permitted Plaintiffs to present a claim of §1983 conspiracy to the jury.

Accordingly, Defendants' Motion to Strike § 1983 Conspiracy Claim is granted.

### G. Defendants' Motion to Strike Document 151 and References to Document Fraud Contained Therein

Finally, Defendants also ask that the Court strike Plaintiffs' Reply brief in support of their objections to Defendants' Summary Judgment Evidence. Defendants complain that the last two pages of the brief allege that Defendants and undersigned counsel engaged in "fraudulent manipulation" of police reports and other allegations of evidence tampering which Defendants complain are "scandalous" and should be stricken pursuant to Rule 12(f).

A motion to strike "is a drastic remedy to be resorted to only when required for purposes of justice. The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Brown Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953). "Motions to strike under Rule 12(f) are generally disfavored. A motion to strike under Rule 12(f) is appropriate only where the pleading asserts an 'insufficient defense' or constitutes a 'redundant, immaterial, impertinent, or scandalous matter.'" *City of Kalamazoo v. Michigan Disposal Serv. Corp.*, 125 F. Supp.2d 219, 221-22 (W.D. Mich. 2000)(citations omitted).

As an initial matter, Defendants' present motion is untimely. The document Defendants seek to strike—Plaintiffs' Reply brief in support of their Objections to Defendants' Summary Judgment Evidence—was filed on February 14, 2019. Yet, Defendants did not file their Motion to Strike until April 9, 2019. A motion to

strike must be made "within 21 days after being served with the pleading."  Fed. R. Civ. P. 12(f).

Even if Defendants had timely filed the instant motion, they still would not be entitled to the relief they seek.  Here, Plaintiffs' Reply brief does not assert an "insufficient defense," nor does it  contain any "redundant, immaterial, impertinent, or scandalous matter."  *City of Kalamazoo,* 125 F. Supp.2d at 221-22.  Rather, Plaintiffs' Rely brief merely brings to the Court's attention the fact that there are multiple versions of the same reports.  There is nothing scandalous about bringing this to the Court's attention.  Accordingly, the Defendants' Motion to Strike Document 151 is denied.

### H. Plaintiffs' Motion to Strike Defendant City's and Defendant O'Reilly's Reply Briefs

In their single motion, the Plaintiffs assert that Defendants' Reply briefs (those filed in support of Defendant City's and Defendant O'Reilly's Motions for Summary Judgment) should be stricken because they fail to comply with this Court's local rules.  The City's Reply brief contains 26 lines of single-spaced text and O'Reilly's Reply brief contains 22 lines of single-spaced text.  Plaintiffs maintain that this is a blatant attempt to circumvent the Court's local rules on page limits which require that briefs in support of a reply be no longer than seven pages.

Plaintiffs claim that if Defendants had properly formatted their Reply briefs, the briefs would easily exceed the seven page limit.

A motion to strike "is a drastic remedy to be resorted to only when required for purposes of justice[,]" *Brown*, 201 F.2d at 822, and if the pleading asserts an "insufficient defense" or constitutes a "redundant, immaterial, impertinent, or scandalous matter." *City of Kalamazoo,* 125 F. Supp.2d at 221-22. Here, there is no basis upon which to resort to the drastic remedy of striking Defendants' Reply briefs. As such, Plaintiffs' Motion to Strike Defendants O'Reilly's and City's Reply briefs is denied.

## V. CONCLUSION

Accordingly, for the reasons articulated above, Defendant John B. O'Reilly's Motion for Summary Judgment [#100] is GRANTED IN PART and DENIED IN PART.

Andreas Barnet's Motion for Summary Judgment [#101] is GRANTED.

Defendant Debra Walling's Motion for Summary Judgment [#105] is GRANTED IN PART and DENIED IN PART.

The City's Motion for Summary Judgment [#98] is GRANTED IN PART and DENIED IN PART.

Plaintiffs' Objections to Defendants' Summary Judgment Evidence Pursuant to Rule 56(c) (2) [#135] are OVERRULED. At trial, the Court will revisit the

issue of the admissibility of the police reports and decide whether Plaintiffs' arguments concerning witness knowledge, hearsay and prejudice should preclude their admissibility.

Defendants' Motion to Strike Affidavit of Hakim Fakhoury and Plaintiffs' Responses to Debra Walling's and the City's Motions for Summary Judgment[#134] is GRANTED IN PART and DENIED IN PART. The last sentence of paragraph six in Hakim's affidavit is stricken.

Defendants' Motion to Strike Plaintiffs' Alleged 42 U.S.C. § 1983 Conspiracy Claim [#157] is GRANTED.

Defendants' Motion to Strike Document 151 and References to Document Fraud Contained Therein [#160] is DENIED.

Plaintiffs' Motion to Strike Defendant City's and Defendant O'Reilly's Reply Briefs[#149] is DENIED.

Counts I is DISMISSED against Defendants O'Reilly, Walling and Barnet.

Count II is DISMISSED against Defendant City.

Defendant Andreas Barnet is DISMISSED.

Count III remains against Defendants O'Reilly, Walling and the City.

Count IV remains against Defendants O'Reilly and the City.

A status conference will be held on <u>Tuesday, May 21, 2019 at 11:00 a.m.</u>

SO ORDERED.

Dated: May 14, 2019

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 14, 2019, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Deputy Clerk